## In re STUDEBAKER CORPORATION.

### No. 1143–B.

District Court, N. D. Indiana, South Bend Division.

Jan. 28, 1935.

John F. Cotter, of South Bend, Ind., for Studebaker Corp. et al.

M. B. & H. H. Johnson, of Cleveland, Ohio, for petitioners. John A. Kling et al.

Winston, Strawn & Shaw, of Chicago, Ill., for trustees.

Winthrop, Stimson, Putnam & Roberts, of New York City, for Common Stockholders' Protective Committee for the Common Stock of the Debtor.

William S. Culbertson, of Washington, D. C., for Preferred Stockholders' Committee.

Tolles, Hogsett & Ginn, of Cleveland, Ohio, for Studebaker Creditors' Protective Committee.

Milbank, Tweed, Hope & Webb, of New York City, for Studebaker Reorganization Committee, and Bank Creditors' Committee.

Snyder, Thomsen, Seagrave & Roudebush, of Cleveland, Ohio, for Independent Preferred Stockholders' Committee.

Schein & Beckwith, of Chicago, Ill., for Common Stockholders' Protective Committee.

Cravath, deGersdorff, Swaine & Wood, of New York City, for Underwriters.

SLICK, District Judge.

The principal questions for decision are insolvency and the fairness of the reorganization plan submitted. The Bankruptcy Act, of which the law under which we are acting in the case at bar is an amendment (section 77B [11 USCA § 207]), provides: "A person shall be deemed insolvent * * * whenever the aggregate of his property * * * shall not, at a fair valuation, be sufficient in amount to pay his debts." Section 1 (15), 11 USCA § 1 (15). During the hearing counsel for opponents conceded that this definition controls here. A person or corporation is therefore insolvent when he or it is unable to pay debts, and this inability to pay debts is not temporary, through lack of ready funds, but permanent through lack of assets convertible in a reasonable time, not necessarily at forced sale, but nevertheless within a reasonable period. Insolvency under the statute and from a commercial standpoint results from inability to pay. If the assets will not sell on the market within a reasonable time for enough to liquidate the debts, insolvency exists.

Here we have a large manufacturing company in receivership for a period of close to two years, and under competent, honest, and efficient management. Every effort has been made to succeed. The receivership resulted because of lack of working capital, coupled with lack of funds to pay then existing indebtedness. The court is not pres-

ently interested in the causes that combined to bring this once successful industry to disaster. True, during the prosperous ten years shortly before receivership it was earning and paying dividends, but in February, 1933, it found itself in a position where it could not carry on. Its accounts and bills payable were over $5,000,000. Its cash resources were practically exhausted.

After receivership drastic economies were applied in its fixed overhead charges, and a strenuous effort made to show profits. An indebtedness of nearly $15,000,000, which had provisions for amortization over a period of ten years, was declared in default, which was within the legal rights of the holders of these securities, bringing the indebtedness, including interest, to the staggering total of over $20,000,000. This does not include receivership and trustees' obligations of over $3,000,000.

Every effort has been made to succeed, but circumstances, over which the court and its receivers had no control, have combined to retard and prevent success. An enumeration of these determining causes would serve no useful purpose now. The outstanding obstacle was the discouraging effect of the receivership on the sales organization and the buying public. Sales resistance, because of the receivership, has been most discouraging and is absolutely impossible of determination.

Many other reasons could be assigned for the failure of the receivers to make a better showing, but these same reasons convince beyond doubt that the present set-up cannot longer continue. Either there must be a reorganization and sufficient working capital made available, or the assets must be liquidated, reduced to cash, and distributed to the creditors. If this is done, under the great preponderance of the evidence the creditors will not receive the full amount of their claims. The inevitable result of all this is that the debtor is now clearly insolvent. Tragedy, yes; but how to have prevented it is a question the answer to which I have searched the record for in vain.

The stockholders, common and preferred, are the owners. They have had two years to come forward with the necessary money, or a plan to raise it, to pay off the creditors. Nothing has been done and no constructive plan suggested. Doubtless many of the stockholders are impoverished to the point where this is impossible. For these unfortunates no one has deeper sympathy than this court. Others without doubt could, if

they would, furnish either all or a part of the necessary funds.

When the company was placed in receivership the court was called upon to decide whether to continue operations or wind up the business. Receiverships are of two general classes that might be designated as constructive and destructive. The first class requires courage, economy, hard work, and clear thinking. The second class requires auditors, appraisers, marshals, and auctioneers. Obviously the second class is the easier course for the court to follow and sometimes, indeed quite frequently, it is the only course open and the quicker the assets are marshaled, sold, and the proceeds paid to the creditors and the receivership wound up, the better. But sometimes a court is justified in continuing the operations of an industry on the prospect of preserving it for the benefit of its owners. Frequently it is difficult to decide whether to continue operations in the hope of bringing the industry out of its financial difficulties, or whether to wind it up as speedily as possible.

. If the court orders immediate liquidation, no amount of criticism will ever be able to say positively that success would have followed permission to operate. On the other hand, if the court orders a continuation of operation and they fail and assets are wasted that could have been sold and applied to debts, the creditors are of course greatly dissatisfied. Studebaker was a good example. This court could have chosen a receiver or receivers who would have been good wreckers and could have liquidated the assets, applied them to the payment of the debts, and wound up the receivership. This would have entailed much less work and worry. The responsibility of deciding whether to liquidate or continue operations was not a light thing and was assumed with a full sense of its seriousness and far reaching effects.

The receivers could easily have lost vast sums to the great detriment of the creditors. Let it be set down to their everlasting credit that they put every ounce of their ability and loyalty into the herculean task of bringing this great industry through one of the most crucial periods of the country's financial and industrial crises, and this in the face of what to some seemed like insurmountable difficulties. Two of these receivers are to be actively engaged in the new company under the reorganization plan submitted.

For two years this court and its receivers have struggled on hoping for the impossible; it has not happened. We are now faced with stern realities. To continue to operate under present conditions could only result in ultimate disaster, not only to the creditors and stockholders, but to many others, who in the past have contributed to the success of this company. To reorganize under the plan submitted will put the new company in a strong financial position and save something for both classes of stockholders, eliminate all present creditors, and bids fair to save a large and useful industry. The result, if successful, will be of inestimable value to the country at large, give needed employment, not only locally to thousands of wage-earners, but to employees in kindred industries from whom large supplies must be purchased. In these times of industrial unrest it would seem that the court must consider these questions seriously before wrecking an industry by putting it on the auction block with all attendant consequences, and especially when 75 per cent. of the creditors and 20 per cent. of the stockholders are petitioning for the reorganization plan under consideration, and those not so petitioning are offering no alternative, but destructive liquidation.

The plan is not perfect, but it is the best —in fact, the only feasible one offered. To refuse the plan spells disaster; to accept it offers a good opportunity for success. The uncontradicted testimony of witnesses familiar with reorganizations similar in size and character to the present one is that the plan, when read and taken as a whole, is fair to all classes of creditors and both classes of stockholders. To hold differently would be to decide against not only a fair preponderance, but all the evidence in the case.

I therefore, in the light of this evidence, hold the plan fair.