[S. F. No. 16847. In Bank. Jan. 31, 1945.]

PACIFIC STATES SAVINGS AND LOAN COMPANY (a Corporation), Plaintiff and Appellant, v. HARLEY HISE, as Building and Loan Commissioner, etc., Respondent; STATE GUARANTY CORPORATION (a Corporation), Intervener and Appellant.

824

Hanna & Morton, John L. McNab, John L. Mace and Leon B. Brown for Appellants.

Sullivan, Roche, Johnson & Farraher and Linforth, Cannon & Miller as Amici Curiae on behalf of Appellants.

Robert W. Kenny, Attorney General, and John J. Dailey, Roy D. Reese and Lenore D. Underwood, Deputies Attorney General, for Respondent.

Maynard Garrison, in pro. per., James M. O'Brien, S. M. Saroyan and Shirley, Robb & Saroyan as Amici Curiae on behalf of Respondent.

SHENK, J.—These appeals are taken from orders and a judgment made and entered in an action brought to challenge the propriety of the seizure by the Building and Loan Commissioner of the State of California of the business and assets of Pacific States Savings and Loan Company, a corporation.

Pacific States was incorporated as a building and loan association in 1889, and continued to do business until its seizure on March 4, 1939. State Guaranty Corporation was organized in 1927 and shortly thereafter acquired all of the guaranty capital stock of Pacific States and all of the outstanding stock of another allied company, Pacific States Auxiliary Corporation. A majority of the stock of State Guaranty is owned by the general public, but at the time of the seizure, State Guaranty Auxiliary owned a large block of its stock. Pacific States and Pacific States Auxiliary are operating companies while State Guaranty and Guaranty Auxiliary are holding companies. The commissioner has contended throughout that Robert S. Odell, who became president of Pacific States in 1928, and the "Odell group" either directly or through proxies

controlled all of the corporations. Many of the officers and directors were common to several of the companies. The trial court adopted the alter ego theory as to at least three of the corporations. For reasons hereafter appearing it is unnecessary to pass upon the correctness of the findings with respect to the alter ego theory.

In 1929 Pacific States was in a good financial condition. Its assets exceeded $53,000,000, of which approximately $7,000,000 were in cash and government bonds and $46,000,000 in mortgage loans on real estate. It had also a capital surplus and undivided profits, substantial holdings in real estate, and there were no unpaid withdrawal notices on file. As a result of the depression that followed, real estate holdings in large numbers were forced upon the company through surrender and foreclosure. By December, 1933, Pacific States had taken over some 3,870 widely scattered small parcels of property. Sales or rentals of such properties became stagnated and the aggregate expense of maintenance became burdensome. Prevailing conditions caused borrowers to default in the payment of their loans, made potential investors unable or unwilling to invest in building and loan associations, and prompted many of the old investors to demand withdrawal. In the interim, the Fidelity Savings and Loan Association of Los Angeles became involved in financial difficulties and Pacific States took over its assets and obligations. In this transaction, Pacific States took over assets (no cash or liquid assets) of an approximate value of $40,000,000, issued definite term certificates in excess of $24,000,000 and assumed liabilities in excess of $13,000,000. At one time the outstanding investment certificate liability of Pacific States approximated $91,000,000.

Over a period of years and up to the time of the seizure here challenged, the certificate liability of Pacific States was reduced to $46,000,000. The commissioner challenges most of the transactions by which the certificate liability was so reduced urging, among other things, that Pacific States, with the assistance of Pacific Auxiliary, intended to freeze out its certificate holders for the purpose of enhancing the value of State Guaranty stock to the ultimate benefit of Odell and his associates, and that by these transactions Pacific States ceased to be a building and loan association but became in fact a real estate holding company. These contentions were upheld by the trial court, but for reasons later appearing it is un-

necessary to determine the correctness of the findings with respect thereto.

On March 4, 1939, the commissioner, acting under section 13.11 of the Building and Loan Act (Stats. 1931, pp. 483-539; Deering's Gen. Laws, Act 986), took possession of the business and assets of Pacific States and placed a custodian in charge. Two days later, Pacific States, as an aggrieved party, challenged the seizure under section 13.12 of the act and prayed the superior court to enjoin the commissioner from further proceeding and to direct return of its business and assets. The commissioner filed an answer alleging the facts that in his opinion justified his action. The trial commenced immediately and continued more than two years. The transcript of the evidence exceeds 26,000 pages and the parties have filed briefs running into hundreds of pages. Briefs have been filed by several amici curiae. The commissioner has assigned and the trial court has found many reasons assertedly justifying the seizure. We shall herein discuss only two of these reasons. Our conclusion with respect thereto makes it unnecessary to express an opinion as to the others. It is immaterial that other grounds also may exist in support of the seizure.

Preliminarily, it is essential that we have before us the provisions of section 13.11 which, under the circumstances and conditions therein prescribed, authorize the commissioner summarily to seize and take over the business and assets of a building and loan association. The section reads: "If the commissioner as the result of any examination or from any report made to him or to any association doing business in this state or its investors or any thereof, shall find that such association is violating the provisions of its articles of incorporation or charter or by-laws or any law of this state, or is conducting its business in an unsafe or injurious manner, he may by an order addressed to such association direct a discontinuance of such violations or unsafe or injurious practices and a conformity with all the requirements of law; and if such association shall not comply with such order within the time specified therein, or if it shall appear to the commissioner that any association is in an unsafe condition or is conducting its business in an unsafe or injurious manner such as to render its further proceeding hazardous to the public or to any or all of its investors, or if he shall find that

its assets are impaired to such an extent that, after deducting all liabilities other than to its investors they do not equal or exceed the sum of the value of its outstanding shares and investment certificates and the par value of its outstanding stock, or if any association shall refuse to submit its books, papers and accounts to the inspection of the commissioner or any of his examiners, deputies or assistants, or if any officer thereof shall refuse to be examined upon oath concerning the affairs of such association, then the commissioner may forthwith demand and take possession of the property, business and assets of such association and retain such possession until such association shall with the consent of the commissioner resume business, or until its affairs be liquidated. Such association may, with the consent of the commissioner, resume business upon such conditions as may be approved by him.''

▮ Among the grounds relied upon by the commissioner in support of his seizure, and found to be true by the trial court, is the destruction of certain papers or records after demand had been made for their inspection by an examiner representing the commissioner. As appears above, it is made a ground of summary seizure under the section ''if any association shall refuse to submit its books, papers and accounts to the inspection of the commissioner or any of his examiners, deputies or assistants. . . .'' The facts surrounding the destruction of certain of the papers or records of Pacific States are set forth in the following finding of the trial court: ''Shortly prior to February 20, 1939, the Commissioner determined to make an extra examination of and to devote extraordinary attention to the affairs of Pacific States, and he authorized his Chief Examiner, Milton O. Shaw, to make such examination, with such assistants as he might choose. On February 17, 1939, pursuant to such authority, Shaw appeared at the office of Pacific States and demanded that he be permitted to make such examination without any restrictions on his activities by Pacific States in so doing. Pacific States refused to permit him to make such examination but on February 20, 1939, Pacific States stated that it would permit such an examination and thereupon the examination commenced. Shortly thereafter Shaw found on the books and records of Pacific States certain figures which were designated 'S.T.P.' and 'S.C.P.' He was informed by its employees that these symbols respectively designated 'sacrifice term price' and 'sacrifice cash

price', that they were related to the assets of Pacific States and that they were supported by appraisals in its files. The figures designated as 'sacrifice term price' were in truth and in fact figures representing the fair market value of the assets of Pacific States as determined from time to time by appraisers employed by it. Shaw thereupon, on or about February 21, 1939, asked Pacific States to show him such appraisals. He was informed by employees of Pacific States that they could not be located. Immediately after Shaw's demand, and after Odell had been informed thereof, Odell directed the officers and employees of Pacific States to remove all of such appraisals from its files and destroy the same, and on February 23d and February 24th, 1939, such officers and employees did secretly remove substantially all of such appraisals from the files of Pacific States, caused them to be taken to the Central Tower Building in San Francisco and to the Hermoyne Apartments in Los Angeles, and there burned them. Odell, prior to the destruction of such records, and prior to ordering their destruction, was advised by one of the attorneys for Pacific States that the Building and Loan Act required it to permit Shaw to inspect such documents. Those documents were destroyed by Pacific States for the purpose of preventing the Commissioner and his examiners and assistants from inspecting them and their destruction constituted a refusal by it to submit them to the inspection of the Commissioner and his examiners and assistants. Those appraisals showed that the fair market value of the assets of Pacific States on March 4, 1939, was many millions of dollars less than the valuations at which such assets were carried on the books of Pacific States. The destruction of these appraisals was a violation, among other things, of the Uniform Classification of accounts established and prescribed by the Building and Loan Commissioner of California."

The evidence supports this finding of destruction of records, and the facts so found justify the seizure. The company may not successfully urge as a defense that the papers contained in great part data relating to obsolete cases, or that the same or similar data could be obtained from other records. It cannot make itself the judge of the importance or relevancy of the documents. If demanded documents are part of the corporate records, the refusal to produce them justifies a seizure regardless of whether it is subsequently discovered

that they were not important. Moreover, the destroyed papers contained information not appearing in any other records of the company. The papers were actually used in the conduct of its business and the commissioner therefore had a right under the act to inspect them. The company president .was so informed by one of its attorneys before he gave the order directing their destruction. As found by the trial court, the documents were destroyed by Pacific States for the purpose of preventing the commissioner and his examiners and assistants from inspecting and acquiring the information therein contained. This destruction constituted a refusal by Pacific States to submit the documents to inspection, and such refusal justified the seizure.

Section 13.11, as shown, empowers the commissioner to take summary possession under prescribed circumstances. Once he has done so, he operates the company. The jurisdiction of the superior court in a proceeding such as this, challenging the seizure under section 13.12, is limited to determining the validity of the takeover. If it be determined that the seizure was invalid, the court may direct the commissioner to return the company. But if it is found on competent evidence that the commissioner has validly taken pos-session for any of the reasons designated in section 13.11, then he alone is charged with the duty of determining in his discretion whether to continue the business after correcting abuses, whether to reorganize, or whether the best interests of the investors and the public will be served by liquidation. In *North American Building etc. Assn.* v. *Richardson,* 6 Cal. 2d 90, 100 [56 P.2d 1221], it was urged that at most a technical impairment existed and that the superior court had power in a proceeding under section 13.12 to determine, even though the seizure was proper, that the retention of possession was unjustified. After stating that the cited section protected an association from any arbitrary or unjust seizure, this court held: ''We find no merit in appellant association's further contention that the *retention* of the business, property and assets of the association by the commissioner was not justified. The statute provides that the commissioner shall retain possession 'until such association shall with the consent of the commissioner, resume business, or until its affairs be liquidated.' Such association may, with the consent of the commissioner, resume business upon such conditions as may be approved by him.' It appears from this language that the

commissioner having once rightfully taken possession of the assets of an association, it lies in his sound discretion whether he will retain possession of them or return them upon an approval of some plan of reorganization.'' This conclusion finds support in that portion of the act empowering him to operate the business and to reorganize. He is not required to return the company to the management that committed or permitted the acts that necessitated the takeover.

It thus appears that the seizure of Pacific States finds ample justification in the unlawful destruction of some of its records after demand therefor. Independently of that ground of seizure the commissioner urged as a further justification for the seizure, and the trial court found, that on March 4, 1939, the assets of the company were materially impaired within the meaning of section 13.11 of the act above quoted. If these findings are supported by substantial evidence they demonstrate not only that the seizure was justified but also that after the seizure there was no abuse of discretion on the part of the commissioner in retaining the assets and in refusing to return the company to its old management. Moreover, the determination of whether the trial court correctly found that the assets were impaired is indispensable in passing on the propriety of its rulings on the motions for attorneys' fees. The propriety of the commissioner's retention of the assets after the seizure should not be confused, however, with the question whether or not he abused his discretion in determining some months after the seizure to liquidate the company. Section 13.12 under which this proceeding was commenced, does not provide for a review of the determination to liquidate, and the trial court in this action challenging the validity of the take-over could not, and did not, pass on the propriety of any contemplated liquidation. As a matter of fact, the court found that ''a judgment for the commissioner in this action will not necessarily result in the liquidation of Pacific States. The determination which the Commissioner has made to liquidate Pacific States is subject to his right to make such other disposition of all or any part of its business, affairs and assets as is or may be authorized by law.'' In other words, liquidation is not the inevitable result of a valid seizure.

Turning to the question as to whether the assets of the company were impaired on March 4, 1939, we find that the

standard by which the commissioner is governed in determining this question is prescribed by the Legislature in section 13.11. The presently material portion of that section authorizes summary seizure of an association by the commissioner "if he shall find that its assets are impaired to such an extent that, after deducting all liabilities other than to its investors they do not equal or exceed the sum of the value of its outstanding shares and investment certificates and the par value of its outstanding stock." Applying this test to the evidence before it, the trial court found that the assets of Pacific States were impaired in an amount exceeding $10,000,000. Specifically the court found that "On March 4, 1939 [the date of the seizure], its assets, after deducting all liabilities other than to its investors, did not equal or exceed, but on the contrary were at least $10,234,422.22 less than, the sum of the value (as defined in the Building and Loan Association Act) of its outstanding shares and investment certificates and the par value of its outstanding stock." It was further found that "The books and records of Pacific States were false and misleading and were not kept in accordance with good accounting practice, and did not on March 4, 1939, truly reflect the financial condition of Pacific States. If the books and records of Pacific States had been kept in accordance with good accounting practice and in accordance with the requirements of the Building and Loan Association Act and of the uniform classification of accounts mentioned above, those books and records would have disclosed upon their face on March 4, 1939, that the assets of Pacific States were impaired on that date to such an extent that after deducting all liabilities, other than to its investors, they did not equal or exceed, but on the contrary were at least $10,000,000.00 less than, the sum of the value (as defined in the Building and Loan Association Act) of the outstanding shares and investment certificates and the par value of the outstanding stock of Pacific States."

These findings are supported by expert testimony indicating that application to the company's books of the uniform classification of accounting system established and prescribed by the commissioner for all associations and application of other proper accounting practices revealed an impairment of assets in excess of $10,000,000. This impairment was also demonstrated by physical appraisals of the assets of the company. In this latter connection the court appointed certain

experts and gave them definitions of "value" to be employed in their appraisals. Using these definitions, the experts reported that the assets were impaired in the amount stated above. One of the experts appointed to prepare and render a report on the financial condition of Pacific States, including its accounting methods and the value of its assets, testified that he had made an examination of all the assets and liabilities of the company, that in so doing it was necessary to reappraise its assets, and that he utilized, as authorized, the services of certain other experts (all of whom likewise testified upon the trial). In response to a question as to what in his opinion was the financial condition of Pacific States on March 4, 1939, the witness replied: "In my opinion as of that date, there existed a deficit in the affairs of the company of $12,756,022.22. As representing a part of that deficit there was a capital stock of $628,600 and a capital surplus of $1,893,000. By applying those against the $12,000,000 deficit there remains an impairment of capital of $10,234,422.22." The testimony of the other experts also substantiates the finding of impairment of assets at the time of the take-over. Thus, in addition to the showing of impairment consequent upon application to the company's books of the established accounting system and practices, the record also contains substantial evidence of impairment based on the physical appraisals by experts. Thus, the challenged findings on this issue are amply supported. This being so, there remains for consideration the question whether the standard of "value" as defined by the trial court for the experts was a correct one.

The standard set down by the court was contained in the following three instructions or definitions: (1) "Market value is the amount this property would sell for if put upon the open market, and sold in the manner in which property is ordinarily sold for cash in the community in which it is situated, with a reasonable time being given to find a purchaser buying with knowledge of all the uses and purposes to which it is best adapted and for which it is capable of being used and make the sale." (2) "In considering the value of property 'Blank' as of March 4, 1939, and without giving any consideration to what this property was worth to the plaintiff for speculation, or merely possible uses, nor what the plaintiff claims or may claim it was worth to it, nor what it may be worth to the plaintiff for purposes other than the highest and

best use to which this property was adapted, nor what this property would bring at a forced sale, nor what this property would sell for under special or extraordinary circumstances, but considering only the highest and best use for which this property was adapted and its fair market value, if offered in the market under ordinary circumstances for cash, a reasonable time being given to make the sale, and considering market value to be the amount this property would sell for if put upon the open market, and sold in the manner in which property is ordinarily sold for cash in the community in which it is situated, with a reasonable time being given to find a purchaser, buying with knowledge of all the uses and purposes to which it is best adapted and for which it is capable of being used, what, in your opinion, was the fair market value of this property on March 4, 1939?'' (3) ''The highest price, estimated in terms of money, which the property would bring if exposed for sale in the open market with reasonable time allowed in which to find a purchaser buying with full knowledge of all the uses and purposes to which the property was adapted and for which it was capable.''

It was urged upon the trial and is repeated here that the rule of fair market value as defined and adopted by the court was erroneous and that the basis of valuation adopted by it was too narrow and restricted and excluded proper and necessary elements of value. Specifically, it is urged that ''(1) the rule of fair market value, as interpreted by the Court, was adopted as the controlling rule of value, (2) no allowance was made for 'going concern value'; (3) the element relating to value of the amount a prudent owner willing, but not forced to sell, would accept, was excluded; (4) the element of an existing fair market was excluded; [and] (5) the element of a cash price was required, to the exclusion of sales on terms.''

The history of this case definitely indicates that challenge 2, having to do with ''going concern value,'' has assumed the position of greatest importance in appellants' attack upon the trial court's definitions of value, and we therefore consider it first.

In light of the purpose of section 13.11, authorizing summary seizure of associations under the circumstances there designated, it is obvious that the reason for ascertaining whether assets are impaired within its meaning is not to determine whether the company shall ultimately be liquidated

but only whether a takeover is justified. This is so because, as said above, liquidation is not the inevitable result of seizure. On the contrary, the commissioner may operate, rehabilitate or liquidate. In determining which of these ultimate courses is most appropriate as regards a particular seized association, conceivably the commissioner will consider all relevant facts and circumstances including whether the association has a reasonable chance of paying off all of its debts, thus giving recognition to "going concern" value as these terms are here used. But, as stated, we are not here concerned with the propriety of his determination with respect to the ultimate fate of Pacific States, or with the factors that influenced that determination. We are presently concerned with the propriety of the seizure in the light of the legislative determination that it is in the best interests of the certificate investors and the public that the commissioner take over an association whose assets are impaired. The legislative intent is clear that if at any time the assets of an association, if sold at other than a forced sale, would not equal its liabilities so that its creditors would not be paid in full, the commissioner, in his discretion, should take over and operate the association. It is not necessary that he delay such seizure until he can determine whether or not as a "going concern" the company may have a reasonable possibility of paying off its debts some time in the indefinite future. To so stay his hand, would mean that an association could not be taken over unless it was in such an advanced state of insolvency as to require liquidation without hope of operation by the commissioner and conceivable ultimate rehabilitation although this latter objective is clearly expressed in the act. ▮ In view of this objective, it must be concluded that the Legislature intended that when a company is in such financial condition that it cannot, if liquidated, pay off its debts, the commissioner should take it over and he, not its management, should carry on its further operation until it can be determined, in his sound discretion, whether the company can safely be returned to the same or a new management, or must be liquidated. We are satisfied, therefore, that the commissioner has the power to take over and operate a company whenever it is insolvent as measured by such a liquidation test. Application of such test, places the commissioner in the position of being able to decide whether certificate holders will bene-

fit most by immediate liquidation, thus minimizing losses, or whether rehabilitation is the more reasonable and practicable course. The standard of "market" value, such as was here employed by the trial court, while adhering to the liquidation theory of valuation, did not assume a liquidation by a trustee in bankruptcy, a type of sale which depresses price, but, rather, a liquidation by the owner with a reasonable time allowed to dispose of the property. To deny the commissioner the power to seize a company until it is not only insolvent as measured by a liquidation test but until all reasonable hope of rehabilitation has vanished, would increase the losses of the investors and of the public.

When the Legislature intended that consideration should be given to "going concern" value of the association, it expressly so provided. In 1935 it adopted an article of the act, as emergency legislation, which did not continue in effect beyond February, 1937, providing for the rehabilitation and reorganization of building and loan associations under certain circumstances (art. XVI, Stats. 1935, p. 814). The plan there provided required the consent of certain creditors, including certificate holders, but eliminated the necessity for the consent of shareholders "if the value of the assets of such association shall be less than the liabilities of such association, including the value of its investment certificates but not including the value of its shares, or if the business, properties and assets of such association be then in the possession of the commissioner. *For the purpose of this article,* real property, . . . loans, and all other assets (whether like or unlike the foregoing) *shall be valued at what may reasonably be expected to be realized therefrom in the orderly and proper conduct of a going business.*" (§ 16.04.)   (Italics added.) When it intended to include a "going concern" value, the Legislature expressly provided therefor, and it definitely limited the definition to "the purpose of this article." Such limitation would be unnecessary had it intended the same definition to be applicable for the purpose of determining whether an impairment of assets existed under section 13.11. Thus, the silence of section 13.11 on the subject and the positive legislative expression thereon in another part of the act can only suggest that the Legislature intended that "going concern" value need not be considered in determining whether an impairment of assets exists within the meaning of section 13.11 to warrant the take-over of an association.

The cases relied on by appellants and decided under section 77b of the Bankruptcy Act [11 U.S.C.A. § 501 et seq.] are of no assistance in the solution of the problem here presented. They deal generally with reorganizations under the Bankruptcy Act and, as under the emergency reorganization section (16.04) of our state act last referred to above, one of the factors to be considered in determining whether a company shall be reorganized is ''going concern'' value, namely, the prospect of its being able to pay off its debts. The test applicable under such circumstances differs materially from that to be applied in determining whether a company shall be taken over and operated. As stated above, if the commissioner prior to seizure must not only determine whether the company is insolvent in the sense that if liquidated it could not pay its debts, but must also first ascertain its future prospects of working out its financial difficulties, the legislative objective unquestionably would effectively be destroyed by reason of necessitous delay in the seizure, a delay that could serve only to increase the insolvency to the point where reorganization or rehabilitation would be impossible. It should also be added that the experts in valuing the various properties that were in fact operating businesses, such as hotels, office buildings, ranches, etc., valued them as going businesses under the court's definitions. In this sense ''going concern'' values were in fact included within the appraisals.

Before leaving the subject of ''going concern,'' as an element of value, reference should also be made to appellants' use of the phrase as meaning the amount by which the value of the assets as a whole, assembled together for the conduct of a business, exceeds the aggregate of the value of the separate items of property. This concept, frequently discussed in rate fixing cases involving the valuation of franchises and public utility properties, can have no reasonable application here where no claim is made of the existence of a possibility of selling all the assets of Pacific States to a single purchaser.

Appellants also urge that while the trial court's definition of value assumed a willing buyer, it failed to assume a willing seller. That market value is the amount for which a property can be sold by a willing seller to a willing buyer, is quite generally recognized. In its first and third directions to the experts the court provided for ''a reasonable time being given to find a purchaser.'' This language is not indicative

of an unwilling seller required to sell at the earliest moment. In the second of its instructions or definitions, the trial court expressly informed the experts that they were not to consider what the assets would bring at a forced sale. These directions, in our opinion, sufficiently eliminated the unwilling seller from consideration by the experts. It might be added that there has been criticism of the willing-seller, willing-buyer test. It is stated in *Helvering* v. *Walbridge*, 70 F.2d 683, 684, that ''Willing adds nothing, for, if the trade goes through at all, both must be willing, and the degree of their reluctance is not a serviceable measure.'' (See, also, *M'Gill* v. *Commercial Credit Co.*, 243 F. 637, 647; 1 Bonbright, Valuation of Property, p. 61.)

■ Nor do we find merit in appellants' criticism that the court's definition excluded the element of an ''existing'' fair market. They urge, in brief, that if the market is in a depressed state when the seizure is made, as of which date the assets must be valued to determine whether there is an impairment within the meaning of section 13.11, consideration should not be given to the amounts for which they actually could be sold on the market, but, rather, to amounts for which they could be sold on a more normal market that might exist some indefinite time in the future. Acceptance of this contention would require a disregard of realities. If the purpose of the valuation is to determine whether the commissioner was justified in seizing the company on the ground of impairment of its assets as of the time of the takeover, and if, as held, an assumed liquidation is to furnish the value test, the question is whether the assets can in fact then be sold for enough to pay the liabilities in full, allowing a reasonable time to complete the sale, but not awaiting the return of a market which is fair or normal to the debtor. (*Cf. Johnson* v. *Land T. B. & T. Co.*, 329 Pa. 241 [198 A. 23, 25]; *Mitchell* v. *Investment Sec. Corp.*, 67 F.2d 669, 671; *In re Studebaker Corp.*, 9 F.Supp. 426, 427.)

■ We turn to appellants' further contention that the trial court's definition of value required a cash price to the exclusion of sales on terms. If, as we have held, the test is value at an assumed liquidation, cash prices necessarily control rather than sales on terms or exchanges for other property. (*Johnson* v. *Land T. B. & T. Co.*, 329 Pa. 241 [198 A. 23]; *Mitchell* v. *Investment Sec. Corp.*, 67 F.2d 669; *People* v. *First St. Bk.*, 274 Ill.App. 46.)

The three definitions or directions set down by the trial court for the guidance of the experts informed them that they were to ascertain the "fair market value" of the assets of Pacific States. They were told that "Market value is the amount this property would sell for if put upon the open market, and sold in the manner in which property is ordinarily sold for cash in the community in which it is situated, with a reasonable time being given to find a purchaser buying with knowledge of all the uses and purposes to which it is best adapted and for which it is capable of being used. . . ." They were next told not to consider speculative or mere possible uses of the property or "what it would bring at a forced sale," but were to consider "only the highest or best use for which this property was adapted and its fair market value, if offered in the market under ordinary circumstances for cash, a reasonable time being given to make the sale. . . ." Later, the court eliminated the "cash" feature and defined market value as "The highest price, estimated in terms of money, which the property would bring if exposed for sale in the open market with reasonable time allowed in which to find a purchaser buying with full knowledge of all the uses and purposes to which the property was adapted and for which it was capable."

In thus defining "fair market value" the court eliminated a forced sale and included a value based upon the highest and best use of the property. It gave the accepted definition of market value. (*Sacramento So. R. R. Co.* v. *Heilbron,* 156 Cal. 408 [104 P. 979]; *Oakland* v. *Pacific Coast Lbr. & M. Co.,* 171 Cal. 392, 399 [153 P. 705]; *Estate of Felton,* 176 Cal. 663, 668 [169 P. 392]; *City of Napa* v. *Navoni,* 56 Cal.App.2d 289, 299 [132 P.2d 566]; *City of Redding* v. *Diestelhorst,* 15 Cal.App.2d 184, 192 [59 P.2d 177]; *City of Stockton* v. *Vote,* 76 Cal.App. 369, 401 [244 P. 609]; *People* v. *Olsen,* 109 Cal. App. 523, 532 [293 P. 645]; *City of Los Angeles* v. *Deacon,* 119 Cal.App. 491, 493 [7 P.2d 378]; *Joint Highway Dist.* v. *Ocean Shore R. R. Co.,* 128 Cal.App. 743, 752 [18 P.2d 413]; *Temescal Water Co.* v. *Marvin,* 121 Cal.App. 512, 518 [9 P. 2d 335]; *Wild Goose C. Club* v. *Butte County,* 60 Cal.App. 339, 341 [212 P. 711].) The fact that the definition so used has most frequently appeared in condemnation cases and in some tax cases does not detract from its applicability here when, as we have held, the liquidation test is to be applied in

determining whether the assets of Pacific States, if sold, would or would not pay off its indebtedness. We are satisfied, therefore, that the definition of value as given by the trial court was proper and that its findings, based on the evidence adduced thereunder, that the assets of Pacific States were impaired on March 4, 1939, within the meaning of section 13.11, are fully supported.

█ We turn to a consideration of the appeals from the orders denying applications for attorneys' fees. As regards the appeal of State Guaranty, the so-called parent corporation, it should first be noted that when it sought and procured leave to intervene in the trial court it did so on the representation that it did not "expect to come here asking for leave of the court to pay its expenses in defending its rights as a stockholder." In addition, it has advanced nothing persuasively suggesting that it should be allowed attorneys' fees. While a parent company may expend its own funds to defend a company in which it holds the controlling stock (*Pratt v. Robert S. Odell & Co.*, 49 Cal.App.2d 550 [122 P.2d 684]), it should not be awarded fees from funds in the commissioner's hands seized from a subordinate company.

█ As pointed out earlier, the trial consumed approximately two years. Neither at its inception nor at any time during this period did Pacific States ask for an allowance of attorneys' fees, although it was at all times represented by competent counsel, nor does it now ask for attorneys' fees for these past services. Its application for an allowance of attorneys' fees was made after the commissioner had rested his case and was for future legal services to compensate counsel during the production of evidence by Pacific States. During the course of the hearing on the application, Odell, the president of Pacific States, was called as a witness and was examined and cross-examined over a period of weeks. During his examination there was considerable discusstion as to whether Pacific States intended to or could produce evidence of the fair market value of its assets. His testimony reveals that the evidence expected to be produced was predicated upon a "normal" market (the time of the arrival of which he admitted he could not foresee or foretell) and not upon the market that existed at the time of the seizure. This subject is discussed above in another connection. In addition, counsel for Pacific States frankly admitted that if the trial court's definition of value was correct (and we have

approved it herein), it would be impossible for them to prove that there was not an impairment of assets. Under the circumstances, it would have resulted in a useless waste of the company's assets to permit the expenditure of its funds for the future services of counsel in the continuation of a case in which admittedly they could offer no evidence to overcome the showing of impairment which showing alone justifies the seizure and retention of assets. ■■■ A seized asociation, as in the case of receiverships, is not entitled as of right to attorneys' fees and costs in resisting the seizure. An application therefor is addressed to the discretion of the trial court and should be granted only upon a showing that the resistance to the seizure is based upon reasonable grounds. (*Cf. Anderson* v. *Great Repub. L. Ins. Co.*, 41 Cal.App.2d 181, 191 [106 P.2d 75]; *Barker* v. *Southern B. & L. Assn.*, 181 F. 636; *Witherspoon* v. *Hornbein*, 70 Colo. 1 [196 P. 864]; *Watson* v. *Johnson*, 174 Wash. 12 [24 P.2d 592, 89 A.L.R. 1527]; *Barnes* v. *Newcomb*, 89 N.Y. 108; *Commonwealth Finance Corp.* v. *Missouri Motor Bus Co.* (Mo.App.), 251 S.W. 756; *O'Malley* v. *Continental L. Ins. Co.*, 343 Mo. 382 [121 S.W. 2d 834]; 89 A.L.R. 1531.)

■■■ As stated above, Pacific States made no application for attorneys' fees until the commissioner rested his case. The request was not for fees already incurred but for attorneys' fees to be incurred in the future in presenting the defense. In denying the application, the trial court had before it the evidence that justified the seizure, and the company, through its officers, was aware of the facts making it subject to lawful seizure. Under all the circumstances, including the admission of Pacific States that it could not offer any evidence to overcome the commissioner's showing of impairment of assets under the trial court's definition of value, here approved, we find no abuse of discretion in the trial court's conclusion that the evidence produced on the application for attorneys' fees was insufficient to justify an allowance for that purpose.

The judgment and orders appealed from are affirmed.

Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Gibson, C. J., did not participate therein.