[S. F. No. 17051. In Bank. May 8, 1945.]

WESLEY KING, Appellant, v. PACIFIC STATES SAVINGS AND LOAN COMPANY (a Corporation), Defendant; FRANK C. MORTIMER, as Building and Loan Commissioner, etc., Respondent.

Raymond Perry and Alden Ames for Appellant.

Robert W. Kenny, Attorney General, John L. Dailey, Roy D. Reese and Lenore D. Underwood, Deputies Attorney General, and B. E. Ahlport and W. G. Harmon for Respondent.

SHENK, J.—This is an appeal from a judgment for the defendant in an action for money had and received. Plaintiff is the assignee of the claims of thirty-eight persons who were formerly holders of investment certificates issued by the defendant, a corporation organized and existing under the laws of this state relating to building and loan associations.

The action was commenced on December 1, 1937. The trial was not completed until the latter part of 1939. In the meantime, on March 4, 1939, the business and assets of the defendant were seized by the Building and Loan Commissioner pur-

suant to the powers conferred upon him by the Building and Loan Act (Stats. 1931, pp. 483-539; Deering's Gen. Laws, Act 986). The present action was continued against the commissioner without further formality of pleading. The order of seizure was affirmed in a separate proceeding brought for the purpose of testing its validity. (*Pacific States Sav. & L. Co.* v. *Hise,* 25 Cal.2d 822 [155 P.2d 809].)

The complaint herein is in the form of a series of common counts for money had and received, each setting forth a different claim and its assignment to the plaintiff. The total of the claims is $35,797.60, representing the difference between the face value of the certificates and the amount theretofore received for them when sold by the plaintiff's assignors at a discount.

The defendant answered denying the indebtedness and alleging, among other things, that the sums referred to in the several counts and sought to be recovered constitute a part of certain amounts which were paid by the plaintiff's predecessors in interest to the defendant in consideration of the issuance to them of investment certificates pursuant to the laws of the state relating to building and loan associations; that those certificates were duly issued to and accepted by plaintiff's predecessors in interest who thereafter and prior to the commencement of this action sold, assigned and transferred them together with all of their rights thereunder; that prior to the commencement of this action said certificates were acquired by Pacific States Auxiliary Corporation which, in turn, sold, assigned and delivered them to the defendant and that they were thereupon cancelled by the defendant; that said certificates were thereby extinguished and that all rights and liabilities thereunder on the part of the defendant were released and terminated. The answer also alleged that in reliance upon the assignments by plaintiff's predecessors and similar assignments by other holders of investment certificates, defendant made transfers of certain of its properties and assets, entered into obligations and otherwise changed its financial position with the result that plaintiff is estopped from asserting the claims here sued on.

The cause was tried on a stipulation of facts and additional evidence introduced at the hearings. At the conclusion of the trial the court found in accordance with the foregoing

allegations of the answer and gave judgment for the defendant.

Examination of the record satisfies us that the evidence does not support the charge made on this appeal that defendant had engaged in a "deliberate and illegal scheme . . . to acquire its investment certificates at a discount" at a time when it assertedly was insolvent. The stipulation of facts does not substantiate the charge. In addition to other matters, it recites "That if said assignors were called as witnesses they would testify that at a date or dates after February 1, 1934, and prior to the dates of the execution of the respective alleged assignments, they called at the office of the Pacific States Savings and Loan Company, and were then and there informed by said company that no funds could at that time be withdrawn under their certificates respectively.

"Said assignors sold their certificates because they needed the money and were afraid of losing their investments if they did not sell.

"Said assignors were further informed that if they wished to sell their certificates they could do so, and it was stated that they could only be sold at a discount."

The contention of the plaintiff that this stipulation of facts requires a finding that plaintiff's assignors "were the victims of coercion" when they sold their certificates at a discount, cannot be sustained. It must be assumed that the stipulation states the truth, namely, that plaintiff's assignors "were afraid of losing their investments," that "they needed money," and that they sold them in order to obtain the needed money even though it was necessary to sell "at a discount." These facts do not compel a finding of fraud and there is no other evidence in the record indicating that plaintiff's assignors were coerced or induced through false and fraudulent representations made to them by defendant or its agents to surrender their certificates for less than face value. The statement that the certificates "could only be sold at a discount" was true. Widespread economic conditions had depressed values generally. The information given that "no funds could at that time be withdrawn under their certificates" was in conformity with the facts and the provisions of the Building and Loan Act. The amendments of 1933 and 1935 (Stats. 1933, ch. 431; Stats. 1935, ch. 163), which applied to the emergency period of the depression years, declared that

the right of certificate holders to withdraw and receive payment was secondary to the duty of the association to provide a reasonable reserve for the payment of taxes, insurance, repairs, etc., provided, however, that an association ''on notice'' should not pay any dividends on its stock. There is no evidence that dividends were paid, or that distribution of profits was made to stockholders by the defendant.

The record fails to disclose evidence of fraud, either actual or constructive, to support plaintiff's charge. The record reflects the following: Prior to April, 1933, there had been much trafficking in certificates on the part of numerous brokers and speculators and to such an extent as to develop a so-called ''racket'' in those activities. Thereafter the defendant furnished names of some of its certificate holders to responsible brokers for the reason that prior to that time it was apparent that the names of many of its investors were in the possession of unlisted brokers, and an abuse in dealing with their certificates had become so pronounced that the defendant decided that it would be preferable, both for the company and its investors, to have as an acknowledged and approved dealer in certificates a brokerage firm of unquestioned integrity and responsibility. Accordingly, at that time, about April, 1933, the defendant furnished to Schwabacher & Company, members of the New York Stock Exchange, the names of such certificate holders as had frequently been disturbing their accounts or pressing demands for funds. The defendant approved a letter which Schwabacher & Company sent to this special list of certificate holders in which that firm expressly stated that it believed that the Pacific States Savings was a well-managed institution and that its certificates were intrinsically worth more than that firm was offering on an immediate cash conversion basis. In February, 1934, after the suspension of withdrawals had been announced, the Pacific States Auxiliary Corporation, a subsidiary of the defendant, applied to the Commissioner of Corporations for a broker's license to deal exclusively in outstanding investment certificates of the defendant. In the application, the Auxiliary Corporation expressly stipulated that it would not take any profit in any of its dealings in such certificates, and there is no evidence indicating that it did not fully and strictly live up to this agreement. After it obtained its broker's license, the Auxiliary Corporation furnished names of investors to a

selected list of brokers pledged to pay investors no less than the current price paid directly by the Auxiliary Corporation. Those brokers pledged themselves to the effect that in any case when a certificate was traded for any other security the latter would be of a comparable market value, and that in no case would they make any misrepresentations or spread any false rumors concerning the defendant.

In attempted support of the charge that the defendant was engaged in a scheme to defraud its certificate holders, plaintiff refers to certain evidence and findings in the above mentioned proceeding of *Pacific States Sav. & L. Co.* v. *Hise*, 25 Cal.2d 822 [155 P.2d 809], wherein the seizure of the defendant company by the Building and Loan Commissioner was challenged. In affirming the order of seizure in that proceeding it was not necessary to consider or determine the sufficiency of that evidence or the propriety of the findings based thereon. The seizure was upheld on other and unrelated grounds. The findings and the evidence in that proceeding are not, under familiar rules on appeal, of such compelling force as to warrant a reversal in this case. The evidence in this case is sufficient to support the findings and conclusions of the trial court that the sale of the certificates by plaintiff's assignors, followed by the cancellation of the same by the defendant corporation, was not fraudulent and that no liability in damages or otherwise accrued to the defendant thereunder. This conclusion makes it unnecessary to express an opinion upon the merits of the defense of estoppel or of other contentions of the defendant.

The judgment is affirmed.

Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Gibson, C. J., did not participate herein.

CARTER, J.—I dissent. It has been made to appear to me sufficiently that the acquisition by defendant of its outstanding investment certificates was the result of a deliberate, illegal scheme to acquire such certificates at a discount, and that in so doing, defendant resorted to fraudulent misrepresentation and coercion. This acquisition of certificates at a discount was one of the component parts of a policy and plan evolved by defendant during the early years of the depression

at a time when its financial structure was in a critical condition. The plan consisted of using its funds, assets, and the proceeds of the sale of its assets, for the purchase and acquisition of its own investment certificates at prices substantially less than the price at which such certificates had been issued and sold to investors by it. The design and purpose of this plan was to create a value for the capital stock of defendant, for the benefit of defendant (and the group in control), and at the expense and to the detriment of its certificate holders. Pursuant to this plan it was to defendant's benefit to acquire as many as possible of the outstanding investment certificates at a discounted price. It did this mainly, through Pacific States Auxiliary Corporation, an alter ego of defendant and Robert S. Odell, defendant's president. Defendant's outstanding certificate liability was reduced from approximately $91,000,000 in 1931 to $46,000,000 in 1939. Not all of the facts surrounding the plan, its formulation and execution are revealed by the record in this case. However, the end sought to be attained is sufficiently clear, also the eagerness on the part of defendant to obtain the certificates (at a discount only), and the implications that were made to appear, contrary to known facts, that if the certificate holders did not care to sell at the discounted prices, they would get nothing.

What the record in this case reveals is not all that we have before us. *Pacific States Sav. & L. Co.* v. *Hise,* 25 Cal.2d 822 [155 P.2d 809], decided January 31, 1945, was an action brought by defendant challenging the right claimed by the state Building and Loan Commissioner in seizing its business and assets. The case was argued before this court on the same day as the instant case and submission of the latter was deferred, upon agreement of the parties, until after the filing of additional briefs in the Hise case, and its submission.

Defendant here was plaintiff in the case of *Pacific States Sav. & L. Co.* v. *Hise, supra,* and in that case was determinedly endeavoring to regain supervision and control over its own affairs. The defendant, Building and Loan Commissioner, represented by the state attorney general (who now represents defendant in this action), likewise considered the issues vital, and on behalf of stockholders, investment certificate holders and the public in general, just as earnestly resisted plaintiff's efforts. The case took over two years to try (the instant action took three weeks). The record pre-

sents a detailed outline of the whole system, manner and method of Pacific States operations over a period of years. Included among the findings of the trial court are findings to the effect that misrepresentation and coercion were resorted to by defendant in the acquisition of its outstanding investment certificates. The findings and judgment in that case are in direct conflict and wholly irreconcilable with the judgment which is affirmed as the result of the majority opinion in this case. It is true that in affirming the judgment for defendant in the Hise case, we did so upon a consideration of conduct on the part of the Pacific States Company, and grounds other than are involved in this case. But we did not disapprove the findings pertaining to fraud and coercion, and by our affirmance in each case we now have two inconsistent judgments involving the same events. Under such circumstances the rule that a reviewing court is bound by the findings of the trial court on conflicting evidence does not apply. It is the proper duty of this court to eliminate the confusion and irregularity and determine the legal effect of the evidence in both cases so as to reach a harmonious result. (*Southern Pacific Co.* v. *City of Los Angeles,* 5 Cal.2d 545 [55 P.2d 847] ; *Colburn Biological Inst.* v. *Shaffer,* 12 Cal.2d 168 [82 P.2d 938] ; *Ferroni* v. *Pacific Fin. Corp.,* 21 Cal.2d 773, 780 [135 P.2d 569].) Moreover, as shown by the deferment of submission above referred to, it was the general understanding of court and counsel that the two cases be considered together and in the light of each other. The majority opinion now takes an incongruous position. It impliedly recognizes the propriety of looking to the findings and evidence in the Hise case and then applies the usual test as to the sufficiency of the evidence in the instant case to support the findings and conclusions of the trial court. But, as above-mentioned (aside from the submission of the cases together), the substantiality of the evidence is not the test where conflicting judgments arising out of the same events are before the court. (*Southern Pacific Co.* v. *City of Los Angeles, supra.*) The entire evidence should be re-weighed and a determination made as to which of the conflicting judgments is correct and should stand.

The findings of misrepresentation and coercion in the Hise case are supported by ample evidence adduced during the long trial, and show the formulation and existence of a plan or scheme whereby the group in control of defendant com-

pany, headed by Robert S. Odell, president thereof, sought to and did freeze out a large number of small investment certificate holders. The outstanding certificate liability was reduced approximately $45,000,000 in the eight years from 1931-1939. By means of financial manipulations defendant purposely placed itself in a position where it had insufficient liquid assets to pay in full investment certificate holders who wished to withdraw. These certificate holders were thereby forced to sell their certificates at a discount in a market controlled by defendant. In addition, an aggressive campaign was carried on to induce other certificate holders to sell at the discounted price as well as to exchange definite term certificates for indefinite term certificates, and to exchange certificates bearing a fixed rate of interest for certificates bearing no fixed rate of interest.

Defendant had been warned by the Building and Loan Commissioner as to the illegality of the practice of purchasing its outstanding certificates at a discount when it had on file withdrawal notices on Pacific States savings. Acquisition was therefore made through Pacific States Auxiliary Corporation or State Guaranty, a corporation. Pacific States Auxiliary was organized to act, and has always acted, as an instrumentality or agency of defendant, of State Guaranty, and of their officers and directors. All of its outstanding stock has been held since the date of its organization by State Guaranty, and through the medium of State Guaranty, it has at all times been dominated and controlled by Odell. State Guaranty was organized for the purpose of acquiring and holding the guarantee capital stock of defendant. At all times since shortly after its organization in 1927 it has been controlled and dominated by Odell, president of defendant corporation. These corporate shells and particularly Auxiliary, purchased defendant's outstanding certificates with money derived from the sale of defendant's property (acquired through foreclosure of trust deeds) and would then turn the certificates over to defendant for cancellation.

The record in the Hise case further reveals that defendant in order to remove the possibility of cash coming in or being on hand out of which certificate holders who had filed notices of withdrawal might claim or insist on payment, sold through Auxiliary or other affiliated agencies, small holdings and individual properties for which there was a market owing to improved economic conditions. The cash obtained was imme-

diately used by the agencies making the sales to acquire for defendant large holdings for which there was no ready or immediate sale,—for example, the Plaza and Clift Hotels, the Santa Barbara Biltmore, the Central Tower (formerly the Claus Spreckels Bldg.), and also some ranch properties in Nevada, known as the "Taylor Ranch" consisting of 98,000 acres owned in fee and approximately 266,000 acres of lease-hold interest. In addition, large scale capital expenditures were made for the improvement of these properties, for example, $626,569.22 was spent upon the Clift Hotel in San Francisco and $209,212.86 on the Plaza Hotel.

Directly bearing upon the question of fraud and coercion, the record in the Hise case reveals that defendant, in order to delude certificate holders and obtain as many as possible of the outstanding certificates at a discount, resorted to various devices, threats and misrepresentations. The certificate holders were personally contacted by means of numerous agents and representatives employed and paid by defendant. As a result of the advice and persuasive efforts of these agents and representatives (contrary to the facts as to the status of the company in many instances, and always in derogation of the future outlook for the certificates) numerous sales were consummated. Stock brokers throughout the state were furnished what had been considered "confidential information" containing the names of certificate holders and the amount of their respective holdings for the purpose of having such brokers solicit the holders and induce them to sell their certificates at the discounted prices. Such brokers and their agents did, by making use of information furnished them by defendant and otherwise, induce and persuade many certificate holders to sell. These brokers were paid an additional 2 per cent in addition to the regular commission of ½ per cent on their sales. The market price for certificates was dependent upon the amount of losses suffered upon the sale of foreclosed properties. Therefore, while these efforts were being carried out on behalf of defendant to acquire certificates, the poorest properties were sold first.

Pacific States' inter-office correspondence, covering a period of years, emphatically evinces the control over the market for its certificates exercised by defendant and the advantage taken of the holders by the agents and representatives of the company. Many letters were placed in evidence showing that "follow-up methods" were pursued by agents of the com-

pany. While some of the efforts were directed at securing consents to conversion, the correspondence illustrates that solicitation for conversion was in the alternative and when it developed that a consent could not be obtained, defendant's agents resorted to sale tactics. On March 25, 1936, T. A. Goldstein, vice president of defendant in charge of advertising and publicity, wrote to R. R. Buthenuth, savings department employee then in Fresno, as follows: "It is quite apparent that some of the contact men have not been severe enough with investors in endeavoring to convert or acquire certificates on notice. In fact some of the contact men in this vicinity have admitted as much. On the whole your record has been very good indeed but I wonder if there were not several occasions where you might have put over the deal if you had been a little more forceful." On April 26, 1932, Van Brunt, vice president of defendant, wrote Odell that he had had no success in purchases of certificates at $40 and would try to obtain them at less than $50, but that "it would be rather detrimental to our next month's purchases if we go back to a price of $50; we might be in the same position we were in a month ago where the public wanted up to $55 and we cooled them down. I don't want to lose the advantage gained." On April 28, 1932, Van Brunt wrote Odell that business was quite good at the price of $50, but that he wanted to start the month at $45 and stay at that figure all the time. On May 1, 1932, Van Brunt wrote that certificate holders thought they could get $50 and it would take the better part of the coming month "to get them out of this idea." On July 7, 1934, G. R. White (vice president of defendant in charge of real estate) wrote Van Brunt a letter directing that "After you have read this letter, I would appreciate your destroying it, and under no condition have it filed." In this letter White stated "our certificate price" is based upon real estate losses. He directed the sale of two-year-old properties regardless of the percentage of loss "in an effort to increase our percentage of loss, so that our certificate price will not run away." On August 13, 1934, White again wrote Van Brunt a letter marked "Confidential" "Please destroy this note." In this letter, White stated that "our losses instead of increasing are being reduced, which is just the opposite from what we should have . . . bring this figure down to a point where it should be."

The extent to which proceeds from sales of real property

were used to acquire certificates was shown by instructions given in a bulletin by White to Van Brunt and others, instructing that on all term sales where net cash was over $100 to "convert the cash that we receive into certificates," and to prepare the usual request for approval. On March 12, 1935, White instructed the real estate department that in the future on term deals where the net cash was $250 or more, "this cash is to be converted into certificates." The legality of the purchases was sought to be upheld, of course, upon the pretehse that the property was sold by Auxiliary and not by defendant; that defendant exchanged the property with Auxiliary for certificates.

It is manifest from the foregoing correspondence that defendant manipulated and controlled the market for its certificates and that in so doing unfair advantage was taken of certificate holders. Much other correspondence was put in evidence. Part of it, particularly relied upon by the defendant Building and Loan Commissioner and his counsel, the attorney general, to show that "high pressure" methods were used in the acquisition of certificates at a discount, was summarized for us by the attorney general and his deputies in the brief of the respondent in that action. In part the summarization is as follows:

"Employees were instructed to urge upon certificate holders who had notices on file or were pressing for funds or whose attitude was bitter, to submit a tender, 'Every certificate holder should be encouraged to submit an offer, but we particularly desire them from the dissatisfied investors'. 'Pass this along in a discreet manner to the force at the Los Angeles office'; (Goldstein to Allison June 26, 1935). Distress claimants were urged to file a tender; and while no price was to be indicated to investors, it was to be pointed out that the lowest prices were the ones which would be purchased. Van Zandt (savings department employee) wrote Goldstein on August 3, 1935, that it 'has been my effort to give the certificate holder the idea that they would be better off by selling than to attempt to meet their obligations by small monthly withdrawals'.

"On March 3, 1936, Goldstein wrote R. R. Buthenuth (savings department employee) that 'while you have done fairly well in obtaining disposal of matured certificates to the Auxiliary Corporation may I personally urge that you give this

every possible effort'. Mr. Kellogg is at present leading the pack.

"Numerous devices were resorted to to produce sales. On March 4, 1936, Goldstein wrote Kellogg that he should explain to the certificate holder that Auxiliary was receiving more certificates than it has funds for, consequently has reduced its offer, and to leave the thought that the offer may be still further reduced; that this 'will have a good psychological effect'. On December 1, 1936, a Goldstein circular suggested reminding the customers that their last chance to dispose of certificates through Auxiliary was drawing near. In one case, Goldstein at the request of an employee wrote a telegram for his use, to indicate no collusion between them, in which he said that the funds for the purchase of certificates were coming from the Auxiliary trust fund and that the funds for purchase might soon be exhausted.

"In a bulletin to numerous employees, Goldstein said: 'Have one final heart-to-heart straight from the shoulder talk with every 'blue card person' in your district. Hit it strong and hit it now.'

"On March 30, 1936, Goldstein to Van Zandt: 'There is every indication that those who have filed notices take the attitude that they are holding the whip hand when approached by our representatives. I do not think that we are going to have any great deal of success until this one attitude is overcome and this can be accomplished only by stressing one point, and one point alone—that you are there as a warning rather than a trader. You have to make the certificate holder feel that he is putting himself in jeopardy by his present condition and that for his own interest he better do something about it.

"On March 11, 1936, Van Zandt wrote Goldstein as to one prospect who had been cheered by seeing Mr. Falch (A. E. Falch, secretary of defendant and president of Auxiliary) : 'If Andy is going around spreading cheer and hope, it sort of stymies our efforts to knock them off the tree. Think Andy should be called off until we have done our act'. On March 24, 1936, Goldstein wrote Van Zandt: 'A little more dynamite please.' 'Perhaps you had better get a little heavier with these people. Lay down the law in emphatic language. Keep following them up until you wear them down.' "

I cannot agree with the majority opinion that the foregoing

and other evidence in the Hise case is not "of such compelling force as to warrant a reversal in this case." The evidence of illegality of the transactions by virtue of which investors parted with their certificates, alone, is sufficient to establish plaintiff's right to recover that which he seeks, the difference between the face value of the certificates and the amount actually received by his assignors. In effect, defendant purchased hundreds of thousands of dollars worth of its outstanding investment certificates at a discount while it had withdrawal notices on file. This constituted a violation of section 6.02 of the Building & Loan Association Act. Pacific States Auxiliary Corporation at all times was merely an agent or dummy. The acts of defendant in stripping itself of cash and preventing the receipt of cash that otherwise would have been available for the protection of all investment certificate holders, were in themselves illegal acts and did not receive the approval of the Building and Loan Commissioner with knowledge of all the facts. As to the matters of fraud and coercion, to me the conclusion is inescapable that defendant violated the fiduciary duty owed by it to its investors in a most flagrant manner. I am in full accord with the findings of the trial court in the Hise case, and the argument of the attorney general that was made in support thereof upon this issue. Much of the evidence introduced in this case was subsequently introduced in the Hise case. Manifestly, however, plaintiff did not have access to all of the material evidence introduced in that case. I am convinced of the truth of plaintiff's charges as to the conduct of defendant company in the management of its affairs and the manner in which it acquired, and plaintiff's assignors disposed of, the investment certificates here concerned. The findings in the Hise case should prevail and the judgment in the instant action be reversed.