Johnson, Appellant, *v.* Land Title Bank &
Trust Company et al.

Argued January 6, 1938.   Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Milford J. Meyer,* with him *Robert M. Bernstein* and *H. Eugene Gardner,* for appellant.

*Edmund R. Finegan* and *Elias Magil,* with them *Walter Biddle Saul,* of *Saul, Ewing, Remick & Saul,* and *Sterling & Willing,* for appellees.

OPINION BY MR. JUSTICE MAXEY, March 21, 1938:

Appellant brought suit against the two appellee banks for maliciously conspiring to injure his credit and business reputation by filing against him unsuccessfully an involuntary petition in bankruptcy. Appellant was nonsuited and the court below refused to take it off. This appeal followed. The nonsuit was entered because the court believed that appellant failed to prove want of probable cause for the filing of the aggrieving petition. It is conceded by appellant that there was no proof of *conspiracy.*

In *Mayer v. Walter,* 64 Pa. 283, this Court, in an opinion by Justice SHARSWOOD, pointed out the distinction between a malicious use and a malicious abuse of legal process. "An abuse is where the party employs it for some unlawful object, not the purpose which it is intended by the law to effect; in other words, a perversion of it. . . . On the other hand, legal process, civil or criminal, may be maliciously used so as to give rise to a cause of action where no object is contemplated . . . than its proper effect and execution. As every man has a legal power to prosecute his claims in a court of law and justice, no matter by what motives of malice he may be actuated in doing so, it is necessary

in this class of cases to aver and prove that he has acted not only maliciously, but without reasonable or probable cause." See also *Garland v. Wilson*, 289 Pa. 272, 137 A. 266, and *Beadle v. Friel*, 320 Pa. 560, 183 A. 761. In actions based on the malicious use of legal process in *criminal* proceedings, for a purpose which the law intended the process to effect, both malice and want of probable cause must be proved. This same principle applies to actions based on the malicious use of legal process in *civil* proceedings, for a purpose which the law intended the process to effect. It is not proved by a termination of the proceedings favorable to the defendant in those proceedings (who has become the plaintiff in the action for malicious prosecution). In *Altman v. Standard Refrigerator Co., Inc.,* 315 Pa. 465, 173 A. 411, we held that to make out a case of malicious prosecution the burden is upon the plaintiff to prove affirmatively, by circumstances or otherwise, that the defendant had no reasonable or probable cause for instituting the original criminal proceedings, and that the prosecution was malicious. This must be proved *in addition to* the termination of the proceedings in favor of the defendant in those proceedings. However, proof of want of probable cause and of malice may be founded on circumstantial evidence. See *Payne v. East Liberty Spear Co.,* 323 Pa. 100, 185 A. 853, and *Stinson v. Smith et al.,* 329 Pa. 177, 196 A. 843.

The record before us shows that appellant in his role of plaintiff below failed to sustain the burden the law cast upon him. On the contrary, defendants (appellees here) appear to have had persuasive reasons for filing against the present appellant an involuntary petition in bankruptcy. Appellant was for many years an extensive real estate operator. He amassed a considerable fortune from operating in real estate in the suburbs of Philadelphia and in Montgomery and Bucks Counties. However, in the fall of 1931 almost all of appellant's real estate holdings had become encumbered with

mortgages. At that period the real estate market was in a precarious condition. In October, 1931, a mortgage bond for $8,000 was placed on record against appellant. This fact aroused apprehensions in the officials of appellee banks as to appellant's financial condition. In December it was learned that appellant's books showed a debt of $32,000 due to his wife which indebtedness did not appear on appellant's financial statements. Appellant told the bank officials that this was not to be considered a "liability," being "a mere family transaction."

On January 15, 1932, appellant owed the Land Title Bank & Trust Company $44,000 and the Industrial Trust Company $7,800. He charged in his statement of claim that these obligations were both unmatured and adequately secured. As a matter of fact, as appellant admitted on cross-examination, neither was the case. Yet on that day he withdrew from his bank accounts the sum of $20,000 in cash, a sum constituting practically his entire cash assets, and applied it to the purchase of an annuity for his wife. He testified that his purpose in doing so was to strip his business of its cash assets, and that if he had had more cash available, he would have bought a larger annuity. He could give no excuse for disposing of his assets in this manner except to state that the annuity seemed attractive and he felt his business was large enough to afford it—an excuse which to his creditors might well seem to break down under the weight of the overdue obligations of him who advanced it.

When appellees learned of this large cash withdrawal, they promptly demanded that the annuity contract be rescinded and the cash returned. This demand availed nothing. Appellant pointed to a $15,000 savings deposit in the Land Title Bank & Trust Company as indicating an adequate amount of cash on hand to meet his business needs. However, this fund had been deposited in appellant's name as security for the payment of rent by one of his tenants, and cannot be considered in the

same light as a general deposit available for all needs. It was at least doubtful whether it could be used by appellant at all. About this time the Land Title Company decided to apply this fund on appellant's indebtedness to it, and on its doing so litigation arose which terminated in this court, where it was decided that the bank as a creditor of Johnson had a right to appropriate this fund by way of set-off: *Handle, to use, v. Real Estate–Land Title & Trust Co.*, 316 Pa. 116, 173 A. 313.

From January until March, 1932, negotiations proceeded between appellant and his creditors, including appellees, looking toward a possible solution of his financial difficulties. Appellant persisted in his refusal to cancel the annuity and he had no cash to meet his obligations. His real estate was wholly encumbered by mortgages approximating between $600,000 and $700,000. Nine-tenths of these mortgages, including all the income-producing lands, had been taken over by mortgagees in possession. Appellant's debts amounted to half a million dollars, and for their liquidation there were no assets available. It was essential that his creditors grant him an indulgence, if he was to continue in business. A creditors' meeting was held in March, and sundry proposals for rehabilitation were made. In April the attorney who then represented appellant proposed to appellant's creditors a plan of financial rescue. This plan likewise proposed surrender of the annuity and return of the cash, and suggested bankruptcy as a possible solution of appellant's difficulties. This plan appellant rejected. Finally the mortgagee of one of appellant's most valuable properties, a theatre, began foreclosure proceedings. Appellees and the Secretary of Banking thereupon, on May 14, 1932, joined in the filing of an involuntary petition in bankruptcy against appellant, that being the last day for filing a petition under the Bankruptcy Act if the purchase of the annuity was to be attacked as an unlawful preference. Appellant demanded a jury trial in the bankruptcy proceedings and

a year and a half later a Federal jury decided that appellant was not insolvent at the time when the bankruptcy petition was filed. The dismissal of the petition followed, and this suit was later instituted.

Appellant's counsel contends that his financial statements presented to appellees from time to time up to January, 1932, showing the values of his real estate holdings, should be taken at face value; and since these indicated a solvent position for appellant, the jury should be allowed to infer from this that the banks had no probable cause for filing against him a petition in involuntary bankruptcy. This contention we must reject. The deflated condition of the real estate market which then existed and still in large measure persists is a matter of public record. Nevertheless when appellant listed his real properties on his financial statements for the information of appellees, he fixed the values himself and appraised them on the basis of a *"normal market,"* a thing which at that time as he himself admitted was nonexistent. This means that his appraisal was not entitled to acceptance by anyone. The appellee banks were certainly under no obligation to accept appellant's appraisal as proof of his solvency.

The test of insolvency under subdivision (15) of section 1 of the Bankruptcy Act of July 1, 1898 (11 U. S. C. A., section 1), is not what appellant's properties might have brought in a *favorable* real estate market under business conditions of a departed era. The test is the amount of cash which these assets would have brought on a fair sale *at the time when the alleged act of bankruptcy, namely, the purchase of the annuity, was committed.* As the court said in *Mitchell v. Investment Securities Corp.,* 67 Fed. (2d) 669, 671: "Statutory as well as commercial insolvency arises out of, and consists in, inability to pay debts. One is insolvent under the statute when his assets, if converted into cash, at a fair not forced sale will not pay them. In both cases solvency is tested by ability to pay debts, in the one case

promptly, in the other, in time. In testing both kinds of insolvency, the realities of the situation control. In both kinds it is the actual, rather than the theoretical, condition of the debtor which determines it." See also *Grandison v. Nat. Bank of Rochester,* 231 Fed. 800. It is clear that the financial statements submitted to appellees were of no controlling force on their judgment and they were entirely at liberty to reject them as unreliable. Such statements are fundamentally too unsound, being predicated on the existence of the non-existent, to wit, a "normal real estate market," to support an inference that appellees, in filing the petition complained of, acted without probable cause. Indeed, common business prudence dictated the action they took.

Appellant's persistent refusal to revoke the annuity indicates that he had the same opinion of his solvency that his creditors had. As the court below aptly said: "If the plaintiff believed honestly that his assets exceeded his liabilities by at least a half million dollars, compared to which the annuity contract was insignificant, then what other reason than a belief in his own insolvency could he have had for refusing to rescind the contract, particularly in view of the fact that by rescinding the contract, he could have obtained the extensions of loans which he so desperately needed. If plaintiff thought he was insolvent, the defendants were certainly justified in thinking so."

The instant case is in some respects akin to *Humphreys v. Sutcliffe et al.,* 192 Pa. 336, 43 A. 954, where the action was for malicious use of legal process. In that case the plaintiff owed money to defendants on a note, payment of which was to be made at a London bank but was refused on the due day. On the same day, after the London banking hours, defendants issued against plaintiff a writ of foreign attachment in New Jersey, by virtue of which perishable property of the plaintiff was seized. Plaintiff subsequently secured dis-

solution of the writ, but not before damage to the property had occurred. It appeared that in New Jersey the right to issue a writ on the same day that payment of a note has been demanded and refused was a doubtful question, never decided by its courts, though the weight of authority was in favor of the right. However, the New Jersey courts refused to allow it, and plaintiff thereafter brought suit in this state alleging that the writ had been maliciously issued without probable cause. Plaintiff was nonsuited. This court affirmed the judgment of the court below in, inter alia, the following language: "It certainly cannot be said that when a creditor issues a process of foreign attachment in the circumstances which are appropriate to the issue of that writ, he has been guilty of issuing illegal process or of doing so with malice or with a malicious purpose, resulting simply from the issue of the process. . . . At the very best that can be said for the contention of the present plaintiff, it was a gravely doubtful question whether his creditors might not issue their writ at the time they did."

The foregoing reasoning is applicable here. Appellees on May 14, 1932, had ample reason to fear that their rights as creditors were daily being further jeopardized. In filing a petition against the defendant in involuntary bankruptcy they acted in accordance with the prescriptions of sound business policy. They cannot now be mulcted because the jury which tried the issue of appellant's insolvency accepted his opinion of the value of his real estate holdings in preference to the countervailing evidence offered by the banks. Neither in actions based on allegedly malicious use of legal process nor in actions based on allegedly malicious prosecution, can defendants in such actions for damages be penalized for having acted initially on well-founded beliefs. In the instant case, proof of either malice or of want of probable cause failed.

The judgment is affirmed.