**Joseph MINA and Josephine Mina, his wife**

**v.**

**Samuel MELNICK and Ida Melnick, his wife, also known as Ida Tonuci.**

### Civ. A. No. 26829.

United States District Court
E. D. Pennsylvania.

Oct. 9, 1963.

---

Hamilton, Darmopray & Malloy, by Perrin C. Hamilton, Philadelphia, Pa., for plaintiffs.

Waldron & Weitzman, by Malcolm H. Waldron, Jr., Philadelphia, Pa., for defendants.

WOOD, District Judge.

This is an action for malicious *abuse* of process. To reach the legal issues in this case, a recital of the rather complicated facts is essential.

From some time prior to 1953, either the plaintiffs or their parents were the sole owners in fee of the premises located at 900, 902, 904 and 909 Morris Street, Philadelphia, Pennsylvania.

At no time did Joseph Rabena, a half-brother of Josephine Mina, have any interest, legal or equitable, in this real estate, a fact known to the defendants.

In August of 1953, Rabena operated a grocery store at 902 Morris Street. He was in need of funds and was recommended to Samuel Melnick as a source of financial aid. As a result, Melnick advanced $4000 of money belonging to his wife,

the co-defendant Ida Melnick, also known as Ida Tonuci. When he did so he demanded that Rabena acknowledge the receipt of $5200 and in addition pay him the sum of $750 for his services in "conveyancing and making the searches and an appraisal of the properties and also for assuming the responsibility and for getting the money." (N.T.154)

Melnick was at that time, and for a long period prior thereto, engaged "as a mortgage broker and an attorney." (N.T.152) In the light of what subsequently occurred his knowledge of the law generally and real estate in particular becomes increasingly important. Also, at this time he was acting both as principal and agent for his wife who was aware or should have been aware of the complete nature of the transactions in which they were involved.

In order to secure the loan Melnick obtained a mortgage against the entire premises in the sum of $5200 from Philip Muratore, step-father of Rabena, notwithstanding that he only actually loaned $4000 and was paid $750 for his services. The rate was six per cent and interest was paid on $5200 rather than on $4000. We place emphasis on that because after process was issued in 1957, the plaintiffs were compelled to satisfy that mortgage in order to clear title to the premises notwithstanding a valid defense as to the amount due and particularly since no foreclosure proceedings were instituted and from the record, there is no evidence that the mortgage was in fact in default.

There were further dealings between Melnick and Rabena but which involved only the defendants and Rabena but which ultimately compelled plaintiffs to pay additional sums to Melnick and his wife. On February 2, 1955, Melnick advanced $1150 of his wife's money to Rabena, immediately took back $150 and collected for a long period of time six per cent interest on the full amount of $1150. On June 7, 1956, the same thing occurred except that he took back $200 on a $1200 transaction.

In 1957, Rabena was unable to keep up his payments to Melnick on the mortgage

transaction and the two loans for which he executed judgment notes.

Melnick and his wife thereupon instituted an action in Equity in the Court of Common Pleas No. 7, March Term, 1957, No. 7159, in which defendants alleged, inter alia, that Rabena was the real owner of the premises and that they, Rabena and the Minas, conspired to defraud Ida Tonuci by transferring property which belonged to Rabena and placing it in names of plaintiffs, Joseph Mina and Josephine Mina. They did this notwithstanding Melnick's having, as a lawyer and real estate broker, searched the title and being personally familiar with the chain of title going back to the original mortgage of 1953. Furthermore, the defendants knew that Rabena could not and did not transfer title since it had always been in her parent or parents name.

At about this time, the Minas had the premises at 900 Morris Street under agreement of sale and obviously the Equity action placed a cloud on the title. The plaintiffs sought the advice of an attorney and after considerable negotiation and threats from Melnick were compelled to satisfy the mortgage in order to complete the transfer. (The exact amount paid to satisfy does not appear in the record, but from all the evidence it was clearly in a disputed amount.)

Melnick then, having forced satisfaction of the mortgage by holding up the sale of 900 Morris Street, instituted a second and similar proceeding in the Municipal Court of Philadelphia (now County Court), November Term 1957, No. 76, in which precisely the same complaint was used except that the property at 900 Morris Street was crossed out. This, of course, had the same result as to the remaining three properties since they were also at that time under agreement of sale. Negotiations were carried on again. In the meanwhile, the Minas were compelled to move out of the property and allow the prospective purchaser to take possession or risk being in default on their agreement of sale.

Eventually, in order to remove the cloud created by the Municipal Court ac-

tion, the plaintiffs were compelled to pay $500 to Melnick and his wife for a debt which they did not owe and were under no obligation, legal or otherwise, to pay. In fact, it is doubtful that Rabena owed them anything.

These facts, adequately substantiated by the evidence and supported by the verdict of the jury, gave rise to the instant litigation.

■ The essential elements of the tort of malicious abuse of process involve: (1) That the process though properly instituted was predicated upon an ulterior motive; (2) that such process was put to an illegal use or perverted beyond its intended purpose; and (3) the plaintiff or his property was arrested or seized. See Grainger v. Hill, 132 Eng. Rep. 769 (1838); Publix Drug Co. v. Breyer Ice Cream Co., 347 Pa. 346, 32 A.2d 413 (1948); Mayer v. Walter, 64 Pa. 283 (1870); Johnson v. Land Title Bank & Trust Company, 329 Pa. 241, 198 A. 23 (1938); Baird v. Aluminum Seal Co., Inc., 250 F.2d 595 (3 Cir., 1957); Sachs v. Levy, 211 F.Supp. 859 (E.D.Pa. 1963); 3 Restatement of Torts, § 682.

The first two requirements need no discussion. That there was an ulterior motive and a perversion of the action is without question and is hardly disputed by the defendants. The sole question is whether or not there was sufficient evidence to constitute "seizure" of plaintiffs' property. In other words, does the satisfaction of the mortgage, the payment of the $500 and the necessity of giving up their home to the prospective purchasers, referred to above, constitute "seizure"?

■ On the motion for directed verdict, we concluded that there was sufficient evidence to find that seizure existed. We have not been able to find any case nor has any been referred to us which is similar to the factual background of the case at bar. But in those cases in which it was held that an action for malicious abuse did not lie, we are of the opinion that they can be readily distinguished.

In our charge to the jury we stated:

" * * * the plaintiffs must convince you by the fair weight of the evidence that the defendants by these lawsuits, the Melnicks by the two lawsuits which are in evidence, seized the property of the Minas. If their property was not seized, then an action for abuse of process cannot lie, no matter how futile or unfounded the action may be. So you must consider whether or not there was a seizure of the property of the Minas by reason of the bringing of these lawsuits and coupling that with the other testimony that you heard from the witness stand.

"It is not, members of the jury, an abuse of process merely to put a cloud on the title to real estate or indirectly to injure a person's credit or good name by bringing a lawsuit." (N.T.171, et seq.)

We further stated:

" * * * legal process carried to its authorized conclusion, even with the worst intentions, standing alone is not actionable." (N.T.172)

We were motivated by the reasoning that if all of the above facts were found to exist by the jury, it was within their province to find whether they constituted seizure guided by our instructions. We considered what a Pennsylvania court would have ruled had the matter been before them.

The leading case in our jurisdiction is Baird v. Aluminum Seal Co., Inc., 250 F.2d 595 (3 Cir., 1957), opinion by Chief Judge Biggs, which is enlightening and comprehensive. However, the facts there, we think, are quite dissimilar. It was an action for both malicious *use* and malicious *abuse* of process. An examination of that case leads one to believe that this action could have been bottomed on "malicious use"; but the question arises —does that preclude an action for "malicious abuse"? Malicious use, as clearly stated there, contemplates process which cannot be justified on the facts. Here the process was one normally used in a case involving equitable ownership and terre tenants. On its face, it was a typical and ordinary complaint. The allegation that it was malicious was for the jury. Were the facts other than as the jury found, the process would have been justified and the question would then be: "Was it put to an illegal use?"

In the Baird case, it was alleged that judgment was wrongfully entered and Chief Judge Biggs stated at p. 600 of 250 F.2d that, " * * * we are of the opinion that the action at bar concerns the *initiation* of proceedings and not a perversion of them and that therefore the suit at bar is bottomed on malicious *use* of process." Here the action was legal on its face and here it was perverted as indicated by the facts. After disposing of the problems of probable cause and malice the Court then turned to the question of seizure. At p. 602 of 250 F.2d, we find that:

" * * * The Pennsylvania Courts following the Statute of Marlbridge (52 Henry III) have held consistently that an action for malicious use or abuse of process will not lie 'If the person be not arrested nor his property seized, no matter how futile and unfounded the action may be.' Garland v. Wilson, 1927, 289 Pa. 272, 137 A. 266; White v. Rosenbaum Co., 1919, 73 Pa.Super. 99. What is more, a mere indirect injury to a person's credit or to his name is insufficient. Snyder v. Shuster, 1921, 37 Montgomery Co.Law Rep., Pa., 259."

Following this, Muldoon v. Rickey, 103 Pa. 110, 113 (1883), is cited for the legal principle that neither a lien nor a cloud on the title is sufficient to create seizure. With this there can be no disagreement as to law of our Circuit. However, there was more here than the mere creation of a cloud or a lien. In the instant case, the perversion of the process took from the plaintiffs money to satisfy a mortgage which went directly to defendants, as did the payment of the $500, and in addition they were forced at their financial peril to move from their home.

In the White case, supra, there was an illegal service of process resulting in an attachment of the rents of the alleged judgment debtor. The Court, at p. 106 of 73 Pa.Super., stated:

" * * * counsel * * * contends that seizure of the plaintiff's property by attachment execution was not a sufficient interference to justify the action; that to entitle the plaintiff to recover, the defendant's action against her had to be begun by seizure of her person or property. We find no such rule laid down in the books.

"In Kramer v. Stock, 10 Watts. 115, the Supreme Court said: 'If one abuses the process of the law, as by maliciously holding to bail, an action lies. So wantonly to levy a second execution after a former levy or for a larger sum than is due, or after the debt has been paid has been held actionable, for all these are illegal and damage is thereby sustained."

Thus, in the case at bar, defendants here, after bringing the action in three separate ways, took from plaintiffs not only more than could be due but funds which were not due at all and, at the risk of being repetitious, indirectly forced them from their home.

In the Garland case, supra, the Court held that an action for abuse of legal process lies only where it is an *unlawful interference* with person or property, under color of the process. In that case, a bill in Equity was involved resulting in the appointment of a Receiver.

" * * * The bill makes the title to that property a main issue * * *. Whether it was or not can be settled in the equity suit, and not in this collateral proceeding. In any event, so long as nothing was done beyond the plain requirements of the bill and prayer, *while it might constitute a malicious use of process, it would not be an abuse thereof.*" 289 Pa. 272, 275, 137 A. 266, 268. (Emphasis supplied)

We distinguish our case because here considerable was done *after* the bill was filed.

The Muldoon case, supra, frequently cited in this type of litigation, we find not to be contrary to our opinion here. That case was bottomed on an unsuccessful action in ejectment and the case holds nothing more than that the mere bringing of an action, no matter how unfounded, bars recovery without more. In fact, that case actually stands for the principle that where there is an actual "interference" with either the person or property, the issue is actionable. At the time of that case, and later, "interference" was the keynote which today has become "seizure."

We clearly recognize the novelty of this case in a difficult field of law. We ask ourselves, on the basis of the cases herein analyzed: what remedy lies in law or equity to a plaintiff in the position of these if this action does not lie?

The development of the facts here left much to be desired, but we find no error which would warrant a new trial and the ends of justice would not be more adequately served were we to grant one. If we have erred, judgment n. o. v. should be entered. If not, the verdict of the jury stands. Accordingly, the following Order is entered:

## ORDER

And now, this 9th day of October, 1963, defendants' motion for judgment n. o. v. and in the alternative for a new trial is denied.